**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 21, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

RICHARD B. NAJAR,

      Defendant - Appellant.

No. 05-2000

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-03-735-3B)**

Terri J. Abernathy, Assistant United States Attorney (David C. Iglesias, United States Attorney, and Damon P. Martinez, Assistant United States Attorney, with her on the briefs), Las Cruces, New Mexico, for Plaintiff-Appellee.

Dennis J. Candelaria, Assistant Federal Public Defender (Stephen P. McCue, Federal Public Defender, with him on the briefs), Las Cruces, New Mexico, for Defendant-Appellant.

Before **SEYMOUR, BALDOCK** and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

      This case presents a timely question of some significance: Under what

circumstances does the Fourth Amendment permit police to enter a home without a

warrant or permission in order to investigate a reasonable belief that a person within is endangered?

Early one morning a police dispatcher received a 911 call. Upon answering, he was met with silence and then a disconnect. He made several attempts to reach the 911 caller. Each time his call was answered but quickly disconnected without a word. He dispatched officers to investigate. Arriving at a mobile home, the officers knocked on the door and announced their presence and purpose. A person could be seen and heard within the home but would not respond to the officers. As the occupant continued to move about, the officers persisted, with increasing vigor, to attract attention. Eventually Richard Najar came to the door. He denied making a 911 call and said no other person was present in the home. Fearing for someone within, the officers entered over Najar's objection. One went to the area where Najar had been moving about to search for a possible victim. An uninjured woman was discovered. The other two officers stayed near the entry door in the living room from where they noticed a shotgun leaning against the wall. They seized the shotgun. Najar was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).

Najar filed a motion to suppress the shotgun evidence. Initially, the district court granted Najar's motion but upon reconsideration, denied it. *United States v. Najar*, No. CR 03-0735 JB, 2004 WL 3426123 (D.N.M. Sept. 3, 2004). Najar entered a conditional guilty plea and was sentenced to thirty months imprisonment. On appeal, Najar admits the shotgun was in plain view but claims the officers' vantage point came from their entry

into his home in violation of the Fourth Amendment.

At sentencing, the district court imposed the minimum guidelines sentence of thirty months imprisonment followed by two years supervised release. The court also imposed an identical alternative sentence, in the event the guidelines be declared unconstitutional. Najar contends his sentence, imposed under mandatory guidelines, constitutes plain error requiring re-sentencing. *United States v. Booker*, 543 U.S. 220 (2005). Our jurisdiction derives from 28 U.S.C. § 1291. We AFFIRM.

## I. The Fourth Amendment

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST., amend. IV.

Honoring the clearly stated language of the amendment, the Supreme Court has repeatedly recognized that only unreasonable searches are proscribed. Illustrative are *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (the Fourth Amendment's "'central requirement' is one of reasonableness"), and *Florida v. Jimeno,* 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness."). In other cases the Court has said the home is entitled to the greatest Fourth Amendment protection. Illustrative are *Payton v. New York*, 445 U.S. 573, 585 (1980) (the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed") (quotations omitted), and *Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("At the very core of the

3

Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.") (internal citation and quotations omitted).

Thus, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton,* 445 U.S. at 586; *see Groh v. Ramirez*, 540 U.S. 551, 559 (2004).[1]

---

[1] In dissent, Justice Thomas noted the tension in the Court's decisions sometimes recognizing a general reasonableness standard and other times seeking to impose a categorical warrant requirement. He observed:

> The precise relationship between the [Fourth] Amendment's Warrant Clause and Unreasonableness Clause is unclear. But neither Clause explicitly requires a warrant. While "it is of course textually possible to consider [a warrant requirement] implicit within the requirement of reasonableness," *California v. Acevedo,* 500 U.S. 565, 582, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (SCALIA, J., concurring in judgment), the text of the Fourth Amendment certainly does not mandate this result. Nor does the Amendment's history, which is clear as to the Amendment's principal target (general warrants), but not as clear with respect to when warrants were required, if ever. Indeed, because of the very different nature and scope of federal authority and ability to conduct searches and arrests at the founding, it is possible that neither the history of the Fourth Amendment nor the common law provides much guidance.
>
> As a result, the Court has vacillated between imposing a categorical warrant requirement and applying a general reasonableness standard. Compare *Thompson v. Louisiana,* 469 U.S. 17, 20, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984) *(per curiam),* with *United States v. Rabinowitz,* 339 U.S. 56, 65, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The Court has most frequently held that warrantless searches are presumptively unreasonable, see, *e.g., Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Payton v. New York,* 445 U.S. 573, 583, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), but has also found a plethora of exceptions to presumptive unreasonableness, see, *e.g.,*

4

But the presumption is not absolute. "When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *McArthur*, 531 U.S. at 330.[2] Thus, the Fourth Amendment does not

*Chimel v. California,* 395 U.S. 752, 762-763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (searches incident to arrest); *United States v. Ross,* 456 U.S. 798, 800, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (automobile searches); *United States v. Biswell,* 406 U.S. 311, 315-317, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (searches of "pervasively regulated" businesses); *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 534-539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (administrative searches); *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (exigent circumstances); *California v. Carney,* 471 U.S. 386, 390-394, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (mobile home searches); *Illinois v. Lafayette,* 462 U.S. 640, 648, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (inventory searches); *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (border searches). That is, our cases stand for the illuminating proposition that warrantless searches are *per se* unreasonable, except, of course, when they are not.

*Groh*, 540 U.S. at 571-73 (Thomas, J., dissenting).

[2] The police prevented McArthur from entering his home until they could obtain a search warrant. Addressing that seizure, the Court reasoned:

[The circumstances here] involve[] a plausible claim of specially pressing or urgent law enforcement need, *i.e.*, "exigent circumstances." Moreover, the restraint at issue was tailored to that need, being limited in time and scope, and avoiding significant intrusion into the home itself. Consequently, rather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.

*McArthur*, 531 U.S. at 331 (internal citations omitted). Considering the

5

prevent a government search of one's house in the absence of a warrant, but it does guarantee "that no such search will occur that is 'unreasonable.'" *Illinois v. Rodriguez,* 497 U.S. 177, 183 (1990). This case is at the intersection of the warrant/reasonableness debate.

The typical Fourth Amendment case deals with police investigation of crime and pursuit of criminals. Almost lost in the welter of search and seizure cases are those involving government actors, often police officers, pursuing other ends. Such legitimate, necessary activities may nevertheless create friction between individual liberties and the need for prompt decisive government action. But that friction is unattended by the typical concern of buffering investigatory zeal with judicial oversight. For example, in *Mincey v. Arizona,* 437 U.S. 385, 392 (1978) the Court told us "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." It cited *Wayne v. United States* in which Chief Justice (then Judge) Burger observed:

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring

---

circumstances in combination, the Court concluded that the restriction was reasonable, and hence lawful. First, the police had probable cause to believe McArthur's home contained evidence of a crime and unlawful drugs. *Id.* at 331-32. Second, they had good reason to fear that, unless restrained, he would destroy the drugs before they could return with a warrant. *Id.* at 332. Third, they made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy by avoiding a warrantless entry or arrest and preventing McArthur only from entering his home unaccompanied. Fourth, the police imposed the restraint for a limited period, which was no longer than reasonably necessary for them, acting with diligence, to obtain the warrant. *Id.*

6

emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of "dead bodies," the police may find the "bodies" to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act,* not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms "exigent circumstances" . . . , e.g., smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, *reasonable grounds to believe an injured or seriously ill person is being held within*.

318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.) (emphasis added). From this discussion in *Mincey*, the emergency aid exigency emerged, informed by the practical recognition of critical police functions quite apart from or only tangential to a criminal investigation. "[B]y design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventative patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis." 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.6 (4th ed.) (quotations omitted).

The multiple roles of police officers was most recently recognized by the Supreme Court in *Brigham City, Utah v. Stuart*, 126 S.Ct. 1943 (2006). There, police officers responded to a 3 a.m. call about a loud party. Upon arrival, the officers heard shouting inside the residence. Proceeding down the driveway, they saw two juveniles drinking

beer in the backyard. Through the screen door and windows, they observed four adults attempting to restrain another juvenile. When the juvenile broke away, he struck one of the adults, causing the adult to spit blood into a nearby sink. An officer opened the screen door and announced the police's presence. Unheard over the tumult, the officer entered the kitchen and shouted out. As the occupants noticed his presence, the altercation gradually ceased. *Id*. at 1946.

The adults were arrested and charged with contributing to the delinquency of a minor, disorderly conduct and intoxication. They moved to suppress all evidence obtained after the officers entered the home, claiming the warrantless entry violated the Fourth Amendment. The trial court granted the motion and the Utah Court of Appeals agreed. *Id*. The Utah Supreme Court affirmed, holding the injury caused by the juvenile's punch was insufficient to trigger the emergency aid or exigent circumstances doctrines. *Id*. at 1946-47.

The Supreme Court reversed, noting "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id*. at 1947. The test is whether the circumstances, viewed objectively, justify the action; "[t]he officer's subjective motivation is irrelevant." *Id*. Under this test, the Court determined the circumstances provided the officer an objectively reasonable belief "that the injured adult might need help and that the violence in the kitchen was just beginning." *Id*. at 1948. The Court also concluded the manner of the officer's entry was reasonable because his shout was equivalent to a knock on the door under the

circumstances. *Id*. With that background precedent, we embark on the fact specific

inquiry necessary to resolve this case. *See United States v. Banks*, 540 U.S. 31, 36 (2003)

("[W]e have treated reasonableness as a function of the facts of cases so various that no

template is likely to produce sounder results than examining the totality of circumstances

in a given case; it is too hard to invent categories without giving short shrift to details that

turn out to be important in a given instance, and without inflating marginal ones.").

## II. Factual Background

At approximately 2 a.m. on the morning of November 25, 2002, Officer Chris

Brown of the Roswell, New Mexico, Police Department received a "call for service" from

Steven Rogers, the police dispatcher.[3] It involved a "911 disconnect" from an address in

Roswell.[4] En route to the address Officer Brown was told by the dispatcher that four

attempts to call the residence resulted in the phone being picked up and hung up each

time. Officer Brown approached the single-wide trailer home, which had a car parked in

the front on the south side. The residence was quiet but the lights were on. He knocked

on the door and loudly announced "police officer" two times. While Officer Brown was

knocking, Officer Oscar Leonard arrived.

The two officers met between the car and the trailer home where Officer Brown

told Officer Leonard that no one was answering his knock. They walked around the

---

[3] A "call for service" is a call requesting assistance from the police department.

[4] A "911 disconnect" means no one speaks or the telephone is hung up when the 911 dispatcher answers the call.

trailer and heard movement inside. Officer Leonard then went back to the front door and again began knocking and announcing "police officer, Roswell Police Department." At that time Officer Brown saw a silhouette of a person move behind a window on the east side of the trailer. When told of the movement, Officer Leonard renewed his efforts to make contact. Despite his announcement of their presence at least five times, no one responded. When there was still no answer, the officers returned to Officer Brown's patrol car and called their supervisor, Sgt. William Brown.

When Sgt. Brown arrived he was advised of the situation and, as Officer Brown testified, at that point, "All we had was movement inside the house. There was no other response. We didn't know if there was someone in there injured or why someone was hiding from us." (Motion Tr. at 18.) Sgt. Brown instructed Officer Brown to go to the front door and knock again, this time using the butt end of his flashlight as well as his fist and to announce their presence in an even louder tone. Officer Brown did so, saying: "This is the Roswell Police Department. Would you open the door? We just want to make sure everyone's okay." (*Id.* at 20.)

In the meantime, Sgt. Brown telephoned Rogers, the dispatcher, to confirm that four call back attempts resulted in answers and hang ups. Sgt. Brown instructed Rogers to try again. As Rogers did so Sgt. Brown stood close enough to the house to hear the phone ringing continuously. Rogers told him there was no answer. Sgt. Brown then went around the trailer to a back window covered with sheer curtains. When Officer Brown was knocking on the front door, Sgt. Brown could see a man come from the east side of

10

the house and walk to the front door, pause briefly, then return to the east side of the house. As the officers continued to knock, Sgt. Brown saw him return to the front door. Sgt. Brown shined his flashlight through the window at the man, then knocked on the window. When the man turned around, Sgt. Brown stepped back and shined the flashlight on himself so that the man could see they were police officers. Sgt. Brown then told him to open the door; he finally complied. Najar opened the door and was met by Officer Brown.

Officer Brown identified himself as a police officer and asked Najar "if everything was okay." (*Id.* at 21.) When Najar said it was, Officer Brown asked him if there was anyone else in the house. As Najar replied that no one else was there, Sgt. Brown arrived at the front door. When Sgt. Brown explained why they were there, Najar immediately denied making a 911 call. Sgt. Brown asked if they could come in and look around. Though Najar denied access, Sgt. Brown told Najar that "[he] felt it was necessary . . . to come in and make sure there was no one hurt in the house." (*Id.* at 61.) Najar stepped back and the three officers entered. Sgt. Brown went immediately to a bedroom in the east part of the trailer where he found a female lying face down on the floor, motionless. Sgt. Brown asked the woman if she was all right and the woman turned, looked over her shoulder and said "yes." (*Id.* at 62.) While Sgt. Brown was in the bedroom, Officer Brown announced from the living room, "I have a shotgun." (*Id.*) The shotgun, with the barrel leaning against the wall, was visible behind a chair approximately three to four feet from the front door.

11

Sgt. Brown spoke with the woman in the bedroom for a few minutes before they both came into the living room where Najar and the other officers were located. After checking the west bedroom to see if anyone else was in the trailer, Sgt. Brown returned to the living room and advised Najar of his *Miranda*[5] rights. He then asked Najar if he had been arrested before. Najar said he had been arrested for possession of cocaine, which was reduced to a misdemeanor, and he had recently been released from jail. Knowing that possession of cocaine is a felony in New Mexico that would rarely, if ever, be reduced to a misdemeanor, the officers believed Najar to be a felon. He was arrested and the officers seized the shotgun for safekeeping and evidence. When the officers arrived at the police station, a criminal history check revealed Najar to be a felon.

### III. Discussion

The district court denied Najar's motion to suppress, concluding exigent circumstances justified the officers' warrantless entry into his home. "The existence of exigent circumstances is a mixed question of law and fact." *United States v. Anderson,* 981 F.2d 1560, 1567 (10th Cir. 1992). Our review entails a determination whether the district court's factual findings are clearly erroneous, viewing the evidence in the light most favorable to the district court's findings. *United States v. Rhiger*, 315 F.3d 1283, 1287 (10th Cir. 2003). "The ultimate question regarding the reasonableness of the search is a question of law which we review *de novo*." *Id.* (quotations omitted).

It is undisputed the officers failed to obtain a warrant before entering Najar's

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

residence and they do not argue Najar consented to their entry. Therefore, unless an exception to the warrant requirement applies, the officers' entry into Najar's home is presumptively unreasonable under the Fourth Amendment. *See, e.g., United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998). The government bears the burden of proving the exigency exception to the warrant requirement applies. *United States v. Wicks,* 995 F.2d 964, 970 (10th Cir. 1993). That burden is especially heavy when the exception must justify the warrantless entry of a home. *Anderson*, 981 F.2d at 1567.

A.     Exigent Circumstances

We have previously applied the "exigent circumstances" exception to warrantless entry when the circumstances posed a significant risk to the safety of a police officer or a third party. *See United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004) (warrantless entry into apartment after ordering everyone out, including defendant who had brandished a weapon, to search for anyone who may have been harmed or injured); *United States v. Flowers*, 336 F.3d 1222, 1231 (10th Cir. 2003) (remand for factual determination whether officers reasonably believed a threat existed as to their safety); *Rhiger*, 315 F.3d at 1288-90 (reasonable belief that officer and public safety threatened by methamphetamine lab); *United States v. Gay*, 240 F.3d 1222, 1228-29 (10th Cir. 2001) (threat to officers' physical safety justified failure to knock and announce); *United States v. King*, 222 F.3d 1280, 1285 (10th Cir. 2000) (exigency existed due to *inter alia* officers' knowledge of possession of firearm coupled with defendant's violent history); *Wicks*, 995 F.2d at 970-71 (combination of factors, including safety, created exigent

13

circumstances); *United States v. Butler*, 980 F.2d 619, 622 (10th Cir. 1992) ("presence of a legitimate and significant threat to the health and safety of the arrestee"); *United States v. Smith*, 797 F.2d 836, 841 (10th Cir. 1986) (totality of circumstances demonstrated exigency relating to officer safety); *United States v. Riccio*, 726 F.2d 638, 643 (10th Cir. 1984) (concern for injury to arrestee justified warrantless entry into home); *But see United States v. Davis*, 290 F.3d 1239, 1243 (10th Cir. 2002) (no reasonable belief that officers' safety or safety of defendant's wife was at risk); *United States v. Bute*, 43 F.3d 531, 538 (10th Cir. 1994) (no exigent circumstances for protection of property justifying warrantless entry).

Prior to *Brigham City*, we used a three-part test to determine whether the risk of personal danger created exigent circumstances:  "(1) the officers must have reasonable grounds to believe that there is an immediate need to protect the lives or safety of themselves or others; (2) the search must not be motivated by an intent to arrest or seize evidence; and (3) there must be some reasonable basis, approaching probable cause, to associate the emergency with the place to be searched."  *Thomas*, 372 F.3d at 1177; *see also Davis,* 290 F.3d at 1242; *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1240 (10th Cir. 2003); *Rhiger*, 315 F.3d at 1288; *Smith*, 797 F.2d at 840.  *Brigham City* clearly rejected the second factor,[6] the subjective motivations of the officers.  126 S.Ct. at 1949.

_____

[6] Although the Court's decision in *Brigham City* has altered how we read our precedent that has considered the subjective motives of law enforcement officers, the two part test we now apply was included in our prior analyses. *See, e.g., Thomas*, 372 F.3d at 1178 ("Under the circumstances of this case, we are satisfied that the officers had reasonable grounds to believe there was an

14

Neither did the Court require probable cause in this type of exigent circumstances. Thus, our test is now two-fold, whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable (a modification of our former third prong.)

### 1. *Reasonable grounds to believe there is an immediate need*

We evaluate whether the officers were confronted with reasonable grounds to believe there was an immediate need "guided by the realities of the situation presented by the record" from the viewpoint of "prudent, cautious, and trained officers." *Anderson*, 154 F.3d at 1233. The inquiry determining the existence of an exigency is essentially one of reasonable belief. *Gay*, 240 F.3d at 1227. We conclude the officers reasonably believed there existed an immediate need justifying their entry into Najar's home for the purpose of providing emergency aid.

Najar presents a two-part argument contending the government failed to demonstrate an immediate need. First, he claims the thirty minute delay between the time the officers arrived and the time they entered his home belies any claim of urgency. We

immediate need to ensure their safety and the safety of others by guaranteeing that no one remained in the apartment."); *Rhiger* 315 F.3d at 1289-90 (facts established "that reasonable grounds existed for the agents to believe there was an immediate need to protect the public by entering the home and discontinuing the lab's production"); *Butler*, 980 F.2d at 622 ("presence of a legitimate and significant threat to the health and safety of the arrestee")*; Smith,* 797 F.2d at 841 (officer's presence on airplane's wing was justified due to concern that the airplane may have been occupied by a person or persons armed and dangerous).

15

disagree. A delay caused by a reasonable investigation into the situation facing the officers does not obviate the existence of an emergency. *See Rhiger*, 315 F.3d at 1290 n.3 (half-hour gap between the detection of the methamphetamine smell and entry of the home did not preclude warrantless entry). Here, the delay was due to the officers' repeated and increasingly vigorous attempts to make contact with the person they could see inside. To their credit, they did not simply batter down the door. We applaud their restraint and circumspection.

In Najar's second line of attack, he argues the facts of this case are easily distinguished from those cases where the courts upheld a warrantless entry into a home based on the emergency assistance exception. *See Riccio*, 726 F.2d at 643 (warrantless entry justified when the defendant fired gunshots at the police and police returned fire, hitting defendant); *see also United States v. Holloway*, 290 F.3d 1331, 1332, 1338-39 (11th Cir. 2002) (911 call reported gun shots and loud arguing, shotgun casings found outside the home); *United States v. Richardson*, 208 F.3d 626, 630-31 (7th Cir. 2000) (911 call stating a possible murder victim was in the basement); *United States v. Hughes*, 993 F.2d 1313, 1314-15 (7th Cir. 1993) (911 caller across the street from a known "dope house" where her thirteen-year-old daughter was inside). Najar maintains the facts of this case are more like the situation in *Davis*.

In *Davis*, law enforcement officers responded to a domestic violence call at approximately 5:30 a.m, entering the residence without consent when the defendant went to the back of the home to get one of his children despite the officers' instructions to stop.

16

290 F.3d at 1240-41. On appeal, we declined to apply the emergency assistance exigency, *per se*, in domestic violence situations. *Id*. at 1244; *see also United States v. Gillespie*, 332 F.Supp.2d 923, 930-31 (W.D. Va. 2004) (no blanket child-welfare exception). Looking at the unique facts in *Davis*, we determined the officers did not face exigent circumstances because: (1) the officers had spoken with the defendant's wife, the possible victim, outside the home; (2) they knew the defendant had children; and (3) there was no history of violence. *Id*. at 1243.

Najar insists the facts of this case are even more benign. He describes a tranquil mid-night scenario: a lone light in a quiet residence casting the shadow of a sleepless occupant. But that is the world of the poet, not the police. The officers arrived in response to a 911 call where the occupant repeatedly refused to answer the telephone or the door. As other courts have recognized, "911 calls are the predominant means of communicating emergency situations." *Holloway*, 290 F.3d at 1339 (citing *Richardson*, 208 F.3d at 630 ("A 911 call is one of the most common--and universally recognized--means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help.")). "Such calls are distinctive in that they concern contemporaneous emergency events, not general criminal behavior." *Id*.[7]

---

[7] This is not to say that a response to a 911 call will always justify a warrantless entry upon the arrival of law enforcement. *See Richardson*, 208 F.3d at 631 ("[W]e do not exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call.").

17

In this case, by the time the officers arrived, they were aware dispatch had been unable to make contact with any occupant. Even more alarming, someone was answering the phone but immediately placing it back on the receiver. We are not persuaded by Najar's insistence that these facts show merely "that someone was home and did not want to talk on the phone at 2 a.m." (Appellant's Br. at 8.) A reasonable person could well be concerned that someone was trying to prevent communication with safety officials, not merely avoid it.[8]

Finally, Najar maintains he was "cooperative" when he finally answered the door and therefore the officers had no reason to believe someone in the trailer was injured. This argument ignores the fact that Najar denied calling 911 and then stated he was the only one in the home. The officers had independent corroboration (the earlier call from dispatch to the home while they were present) that the call did come from Najar's residence. Therefore, it was eminently reasonable for them to conclude that Najar was either lying about making the call or about being the only occupant. Given the totality of the circumstances, the officers had reasonable grounds to believe someone inside the trailer may have been in need of emergency aid and immediate action was required.

B.     Whether the manner and scope of the search is reasonable

---

[8] The officers testified it is not uncommon for a 911 call to be made by mistake. However, both Officer Brown and Sgt. Brown testified the common response in such situations is the occupant answering the door, providing an explanation and, if necessary at that point, allowing the officers to enter in order to assure the occupants' safety. Moreover, a mistaken 911 caller would likely respond to the police dispatch in order to avoid police presence at the caller's home in the wee hours of the morning.

18

While the first factor considers whether there is a reasonable basis to believe an emergency exists, the second factor necessarily deals with the manner and scope of the search. The officers observed Najar walking to and from a specific place inside the trailer. Upon entering, Sgt. Brown went immediately to that area, while the two other officers waited in the living room where the gun was found. Sgt. Brown did not attempt to search any place beyond the locations where a victim might likely be found. Once he determined that the female was not in need of immediate aid, he limited the remainder of the search to a quick look into the second bedroom. No further intrusion occurred.

The officers confined the search to only those places inside the home where an emergency would reasonably be associated. In sum, the officers had reasonable grounds to believe there was an immediate need to investigate concerns for the life or safety of another and reasonably effected the search. Consequently, the entry and search of Najar's home was lawful.

## IV. Sentencing

Najar requests resentencing in light of the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), and this Court's decision in *United States v. Labastida-Segura,* 396 F.3d 1140 (10th Cir. 2005). In *Booker,* the Supreme Court held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 543 U.S. at 244. To remedy the Sixth Amendment difficulties within the

19

Sentencing Guidelines, the Court invalidated the mandatory application of the guidelines and instead required district courts to consult them in an advisory fashion. *Id.* at 245 (excising 18 U.S.C. §§ 3553(b)(1) and 3742(e)). Najar argues a non-constitutional *Booker* error occurred at sentencing because the district court treated the guidelines as mandatory rather than advisory when imposing the first sentence. *See United States v. Gonzalez-Huerta,* 403 F.3d 727, 731-32 (10th Cir. 2005) (discussing the difference between constitutional and non-constitutional *Booker* error).

Because Najar did not raise this issue below, we review his claim for plain error. "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 732. The first two prongs of the plain error test are met by non-constitutional *Booker* errors. *Id.* Under the third prong, the defendant bears the burden of establishing that the error affected the outcome of the proceedings. *Id.* at 733. To do so, the defendant must show "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Id.* (quotations omitted).

At sentencing, the district court imposed the minimum guideline sentence of thirty months imprisonment followed by two years supervised release. The court also imposed an identical alternative sentence, should the guidelines be declared unconstitutional. Thus, we are not left "in the zone of speculation and conjecture" in determining what the district court would do if the guidelines were not mandatory. *Labastida-Segura,* 396 F.3d

20

at 1143. Here, as in *United States v. Serrano-Dominguez*, "[t]he district court applied the sentencing methodology suggested in *Booker* and concluded that even if the Guidelines were not mandatory [the defendant] would receive the same sentence . . . . A remand would needlessly burden the district court and counsel with another sentencing proceeding, which we know would produce the same result." 406 F.3d 1221, 1224 (10th Cir. 2005); *see also United States v. Corchado*, 427 F.3d 815 (10th Cir. 2005) (remand unnecessary in light of alternative sentence), *United States v. Cornelia-Pena*, 435 F.3d 1279 (10th Cir. 2006) (same).

## IV. Conclusion

Applying the emergency assistance exigency exception, we **AFFIRM** the district court's denial of Najar's motion to suppress. Because the district court clearly indicated the sentence it would impose were the guidelines dissolved, we also **AFFIRM** Najar's sentence.