COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, AtLee and Senior Judge Annunziata
Argued by teleconference

ENDALKACHEW MERID

v.      Record No. 1145-19-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE WILLIAM G. PETTY
MAY 12, 2020

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
James C. Clark, Judge[1]

Samuel C. Moore (Law Office of Samuel C. Moore, PLLC, on
briefs), for appellant.

Kelsey M. Bulger, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


In this appeal, we consider whether the trial court erred in refusing to suppress evidence that

police discovered after entering an apartment to prevent an occupant from committing suicide.

Because we conclude that the officers' actions were reasonable and thus did not violate the Fourth

Amendment, we affirm the judgment of the trial court.

I.  BACKGROUND

"In reviewing a trial court's denial of a motion to suppress, 'we determine whether the

accused has met his burden to show that the trial court's ruling, when the evidence is viewed in

the light most favorable to the Commonwealth, was reversible error.'" Cantrell v.

Commonwealth, 65 Va. App. 53, 56 (2015) (quoting Roberts v. Commonwealth, 55 Va. App.

146, 150 (2009)).

_____

[1] Judge Lisa B. Kemler heard and denied the motion to suppress. Judge James C. Clark
presided over the jury trial and signed the final order.

"[A] defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review *de novo* on appeal." King v. Commonwealth, 49 Va. App. 717, 721 (2007). On appeal, we are "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Cantrell, 65 Va. App. at 56 (quoting McGee v. Commonwealth, 25 Va. App. 193, 198 (1997) (*en banc*)). "However, we consider *de novo* whether those facts implicate the Fourth Amendment and, if so, whether the officers unlawfully infringed upon an area protected by the Fourth Amendment." Id. (quoting Hughes v. Commonwealth, 31 Va. App. 447, 454 (2000) (*en banc*)).

On October 18, 2017, the Alexandria Police Department received a call about Endalkachew Merid. Early that morning Merid texted his brother Asteway, saying that life had been hard for the past nine years, that he had "been struggling, pretending," and that he was going to "join" their deceased mother. The messages ended with the plea "[P]lease forgive me for my weakness."

Unsettled by these messages, Asteway and his wife called Merid's cell phone. Merid answered but did not speak for long, telling them that he was "sleepy" and "fine." During the next few hours, Asteway tried unsuccessfully to reach Merid on the phone again. Asteway left work around 3:00 p.m. and went to Merid's apartment, where he noticed that the car Merid drove was in the apartment parking lot. He tried knocking on the door, and he also tried calling Merid through the intercom. Unable to reach him by any of these means and concerned for Merid's welfare, Asteway called the police.

Officers Izzi and Matteson came to the apartment in response to Asteway's phone call. Asteway was "very concerned." Asteway showed Officer Izzi the text messages, explaining that

Merid claimed he was going to "join" their deceased mother. He told the officers that he had attempted to reach Merid that day and that he thought Merid was home, because the car Merid drove was in the parking lot. The officers ran the tags on the car and discovered that it was not registered to Merid, and Asteway explained that Merid did not own the car.

The officers began to knock on the apartment door, and they heard a male voice inside saying "something about getting dressed or clothes." Officer Izzi announced that they were police. Asteway also tried to talk to his brother through the closed door. As the officers continued knocking, they heard "some sort of garble, throw up, suction noise," which Officer Izzi described as "very strange" and "alarming." Officer Matteson described the sound as "a gargling sound mixed with some coughing and moaning, like pain." Officer Izzi asked if the occupant was okay. He testified, "[t]hought I heard maybe a yeah. Asked if he needed medics. He said no. Asked him – kept knocking, asking him to come to the door so we could see. Make sure everything's ok." There was no further response from inside the apartment, except for the strange noise.

The officers unlocked the door with a maintenance key, still announcing their presence and calling for Merid to come to the door. Hearing the "alarming" noise again and unable to open the door because the chain latch was engaged, Officer Izzi "shouldered the door open." The apartment was dark.

Officer Izzi immediately saw that Merid was on the couch, using a large kitchen knife to repeatedly stab himself in the throat. Officer Izzi ran over to the couch, "held [Merid's] arm down[,] and pried the knife out of his hand." Officer Matteson called for medics, and they both attempted to stop the bleeding until the medics arrived about five minutes later.

When the medics arrived and began administering aid, the officers stepped away a few feet and waited. Officer Izzi recalled that, from his point of view in the dining area, he was able

to see the entire apartment but for the bedroom.  At that point, the acting sergeant—who was now on-scene—reached his head in the door and "asked if the apartment had been checked for anyone else."  Officer Izzi testified,

> We had already seen the living room, the dining room, and the kitchen.  But to my rear was the bedroom door.  So I told him that I would check to ensure that there was no other person or pets or anything like that in the apartment.  And I then went and checked the bedroom.

He stepped three or four feet to the bedroom, opened the door, and saw a female body lying on the ground.  She was "tied to the chair.  Her head was wrapped in plastic . . . .  And there was dried blood pooled on the floor all around her."  The body was discovered to be that of June Seals, the owner of the car in the parking lot and the only person listed on the rental agreement.  Officer Izzi notified the sergeant and the medics, and he secured the bedroom as a crime scene.  Merid was then transported to the hospital.  The next persons to enter the room were detectives, who had obtained a search warrant.

Merid was subsequently indicted for the abduction and murder of June Seals, in violation of Code §§ 18.2-47, 18.2-32, and 19.2-221.  He moved to "suppress all evidence, and its fruits thereof, recovered on October 18, 2017, through an unlawful search of [his] residence."[2]  The trial court denied the motion to suppress, finding the community caretaker exception to the Fourth Amendment applied to the search and the evidence would have been inevitably discovered.  Following a jury trial, Merid was convicted of both counts and sentenced to life in prison, plus ten years.

---

[2] The trial court found that "[Merid] would have an expectation of privacy in the apartment for purposes of the Fourth Amendment."  The Commonwealth does not challenge Merid's standing on appeal, so we will not address that issue.

II. ANALYSIS

Merid argues that the trial court erred in denying his motion to suppress because the entry into the apartment and the search of the bedroom violated the Fourth Amendment. We disagree and hold that both the entry into the apartment and the search of the bedroom were justified under the emergency aid exception to the Fourth Amendment.[3]

A. Initial Entry into the Residence

We first consider the law pertaining to an officer's initial entry into a residence to render emergency aid. It is well-established that under the Fourth Amendment, "[s]earches and seizures conducted without a warrant are presumptively invalid." Cantrell, 65 Va. App. at 59. However, this "'presumption may be overcome in some circumstances' because the 'warrant requirement is subject to certain reasonable exceptions.'" Ross v. Commonwealth, 61 Va. App. 752, 759 (2013) (quoting Kentucky v. King, 563 U.S. 452, 459 (2011)); see also Kyer v. Commonwealth, 45 Va. App. 473, 480 (2005) (*en banc*) (recognizing that the Fourth Amendment "condemns only 'unreasonable' searches and seizures"). Indeed, "reasonableness is always the touchstone of Fourth Amendment analysis." Birchfield v. North Dakota, 136 S. Ct. 2160, 2186 (2016).

---

[3] The trial court upheld the initial entry under the community caretaker exception, and it upheld the subsequent entry into the bedroom as a protective sweep pursuant to an emergency custody order. The substance of the issue, however, embodies the rationale underlying the emergency aid exception.

Caselaw from this Court has been less than clear in the past when discussing the emergency aid exception and the community caretaker exception, often conflating the two. See Ross v. Commonwealth, 61 Va. App. 752, 760 (2013) (analyzing the exceptions separately but noting that both would permit police to enter a residence when individuals inside are in physical danger); see also Cantrell, 65 Va. App. at 60 (holding that the community caretaker exception permits police to "conduct a warrantless inventory search of a vehicle" if certain conditions are met). On appeal, the Commonwealth has recognized this overlap and cited to both exceptions.

We conclude that the applicable doctrine is the emergency aid exception, and we will address the parties' arguments based on substance, not label. This is in accord with the principle that "[a]ppellate courts do 'not review lower courts' opinions, but their *judgments*.'" Evans v. Commonwealth, 290 Va. 277, 288 n.12 (2015) (quoting Jennings v. Stephens, 574 U.S. 271, 277 (2015)). Consequently, "[a] lower court's judgment, if legally correct, will be affirmed even if we were to disagree with the lower court's legal reasoning." Id.

"One concession to reasonableness" is the emergency aid exception to the warrant requirement, which "recognizes the 'right of the police to enter and investigate' when someone's health or physical safety is genuinely threatened." Kyer, 45 Va. App. at 480 (citation omitted). The exception "rests on the commonsense rationale that 'preservation of human life is paramount to the right of privacy.'" Id.; see also Brigham City v. Utah, 547 U.S. 398, 403 (2006) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (quoting Mincey v. Arizona, 437 U.S. 385, 393 (1978))). The emergency aid exception also "takes into account that 'police owe duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventative measures, and providing services on an emergency basis.'" Ross, 61 Va. App. at 760 (quoting Kyer, 45 Va. App. at 480).

Under the emergency aid exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City, 547 U.S. at 403. This type of exigency[4] permits entry if the officers have "'an objectively reasonable basis for believing' . . . that 'a person within [the house] is in need of immediate aid.'" Michigan v. Fisher, 558 U.S. 45, 47 (2009) (*per curiam*) (quoting Brigham City, 547 U.S. at 406, and Mincey, 437 U.S. at 392).[5]

---

[4] The Supreme Court in Birchfield, 136 S. Ct. at 2173, characterized "the warrantless entry of private property when there is a need to provide urgent aid to those inside" as a type of exigent circumstance.

[5] The Supreme Court recognized the validity of this type of conduct again in 2012, when it held that for purposes of qualified immunity, "[a] reasonable police officer could read [prior Supreme Court decisions] to mean that the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence." Ryburn v. Huff, 565 U.S. 469, 474 (2012).

- 6 -

## B. Cursory Sweep Following an Entry

We must also consider whether officers may conduct a cursory sweep of a residence after entering pursuant to the emergency aid exception. It is well-established that "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" Mincey, 437 U.S. at 392 (citation omitted). Based on this tenet, we will not impose a bright-line rule that would confine the police to the immediate physical space surrounding the emergency when they have entered to provide aid. Doing so would ignore the over-arching principle that reasonableness—not line-drawing—"is always the touchstone of Fourth Amendment analysis." Birchfield, 136 S. Ct. at 2186. We choose instead to heed the axiom that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Graham v. Connor, 490 U.S. 386, 396-97 (1989).

While there is no Virginia case that directly addresses this issue, there is support elsewhere for the principle that police may conduct a cursory sweep after entering to render emergency aid. In United States v. Najar, 451 F.3d 710 (10th Cir. 2006), the Tenth Circuit Court of Appeals upheld the entry and search of a residence under the emergency aid exception to the Fourth Amendment. There, police received a 911 call that was quickly disconnected, and after several attempts to reach the caller, who would answer and then hang up, officers went to the residence to investigate. Id. at 712. After knocking and announcing, the officers noticed a person moving around inside who did not respond until they "persisted, with increasing vigor, to attract attention." Id. When Najar, the defendant, finally came to the door after approximately thirty minutes, id. at 719, he denied calling 911 and told officers he was the only person in the residence, id. at 712. Despite his claims, officers entered the residence and searched "for a possible victim." Id. at 712. One officer discovered an unharmed woman in a bedroom near the

area where Najar had been seen, and he conducted a quick search of the remaining bedroom.  Id. at 717, 720.  Another officer found a shotgun in plain view in the living room.  Id. at 717.  Najar was subsequently charged with violation of a federal statute prohibiting possession of a firearm by a convicted felon.  Id. at 712.

The court in Najar applied a two-part test to determine if the officers' actions were valid under the Fourth Amendment:  "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."  Id. at 718.  The court found the officers could have reasoned that someone inside the residence was "trying to prevent communication with safety officials" and that Najar was lying either about calling 911 or about being the only person inside the residence.  Id. at 720.  In addition, the court reasoned, the delay caused by the officers' "reasonable investigation" did not "obviate the existence of the emergency."  Id. at 719. Having concluded that the entry was justified, the court also found that the manner and scope of the search was reasonable because the officers "confined the search to only those places inside the home where an emergency would reasonably be associated," namely, "where a victim might likely be found."  Id. at 720.  Once they searched the bedrooms, "[n]o further intrusion occurred."  Id.  Both the basis and the extent of the actions were reasonable.  Id.

Likewise, in Stricker v. Township of Cambridge, 710 F.3d 350, 362 (6th Cir. 2013), the Sixth Circuit Court of Appeals found that police were justified in entering and sweeping a residence when they "had an objectively reasonable belief" that an occupant was suffering from a drug overdose and that his family was "attempt[ing] to hide the drug overdose from the police."  Once the police were inside, the court held that it was "objectively reasonable for the officers to conduct a protective sweep" to not only locate Stricker but also "secure the premises" and protect "EMS, themselves, and others on the . . . property."  Id.  The protective sweep was

permissible even though it was extensive—the occupants alleged that officers searched through drawers and cabinets—because police could have been searching for "clues as to what [Stricker] ingested, in order to aid EMS." Id.

Several state courts are also in agreement. The Supreme Court of Delaware has held that under the emergency aid exception, police may conduct "not only a search of the premises to find people in need of aid, but also [conduct] a protective sweep to ensure no further danger is present," provided such action "is limited to 'those areas necessary to respond to the perceived emergency.'" Guererri v. State, 922 A.2d 403, 407 (Del. 2007). Similarly, in State v. Horngren, 617 N.W.2d 508, 513 (Wis. 2000), the Supreme Court of Wisconsin held that officers may conduct a protective sweep after they have entered a residence to render emergency aid, if reasonable "under the totality of the circumstances."[6] The court held that officers acted reasonably when they conducted a "sweep" of an apartment after entering in response to a suicide threat, because they suspected weapons might be in the apartment, and the occupant told them there was "'a girl' in the back bedroom." Id. In Commonwealth v. Kaeppeler, 42 N.E.3d 1090, 1096 (Mass. 2015), the Supreme Court of Massachusetts addressed entry and search under the emergency aid exception as one entity, requiring that "the police [must have] an objectively reasonable ground to believe that an emergency existed" and that "the conduct of the police after the entry [must be] reasonable under all the circumstances."

C. The Officers' Actions Did Not Offend the Fourth Amendment

Considering all of the above principles, and applying the rule that officers may conduct a cursory sweep of the residence after entering pursuant to the emergency aid exception if reasonable, we hold that the officers in this case did not violate the Fourth Amendment in

---

[6] The court referred to this exception as "community caretaker activity." Horngren, 617 N.W.2d at 513.

entering the apartment and opening the bedroom door. First, the officers had an "'an objectively reasonable basis for believing' . . . that 'a person within [the apartment was] in need of immediate aid.'" Fisher, 558 U.S. at 47 (citations omitted). The officers received information from dispatch about a possible suicide threat. Once they arrived at the apartment, they were met by Merid's brother Asteway, who was "very concerned" for his brother. Asteway showed the officers text messages where Merid discussed "join[ing]" his deceased mother and asked his brother to forgive him. Asteway told the officers that he had not been able to reach Merid all day. Concern intensified when Merid did not come to the door despite repeated requests by the officers and Asteway. The officers testified that although Merid responded that he was "getting dressed" and did not need medics, they continued to hear an "alarming" sound that they described as "garble, throw up" and "coughing and moaning, like pain." Based on these troubling circumstances, the officers had an objectively reasonable basis for believing that the occupant inside the apartment needed—whether welcomed or not—immediate aid.

Once inside the apartment, the officers acted reasonably under all the circumstances. The officers walked into an especially violent suicide attempt and wrestled Merid to confiscate the knife. Although Merid was restrained at the time that Officer Izzi entered the bedroom, it was not out of the realm of possibility—and indeed it was the case—that someone else in the apartment might have been subjected to violence. In addition, the officers knew that the car Merid drove was registered to someone other than Merid, which could have suggested that the car owner was in the apartment, too. Furthermore, the officers were aware that EMS was about to transport Merid to a hospital. As far as the officers were concerned, there might have been a pet, a child, or an adult in need behind that closed bedroom door. It was certainly reasonable for the officers to ensure that the premises and any other occupants were safe and secure before they left. In fact, it would have been irresponsible for them to have done otherwise.

- 10 -

Finally, Officer Izzi's actions were minimally intrusive—he simply walked a few feet to check the one remaining area in the residence.  He did not empty drawers or cabinets.  While referred to as a search, he took the minimum necessary steps to ensure that it would be safe and prudent to leave the scene.  And, instead of proceeding to search the apartment and collect evidence pertaining to the murder, the officers did exactly what the Fourth Amendment commands; they sought and obtained a search warrant from the magistrate.

We are persuaded that the salient point in this discussion—as in all Fourth Amendment matters—remains whether officer conduct is reasonable under all the circumstances.  Therefore, instead of adopting a *per se* rule either in favor of or against the constitutionality of a sweep under the emergency aid exception, we will again recognize that officers must act in an objectively reasonable manner when acting without the authority of a warrant.  Here, the officers acted well within the realm of objective reasonableness.  Having so concluded, we must always recognize that

> [t]he "heavy costs" of suppressing the truth, should always be a court's "last resort, not [its] first impulse."  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  This deliberateness requirement focuses "the inquiry on the 'flagrancy of the police misconduct' at issue."  The rule thus seeks "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  Only in such circumstances can the violation be deemed "patently unconstitutional" or be characterized as "flagrant conduct," thereby justifying exclusion.

Collins v. Commonwealth, 297 Va. 207, 215 (2019) (citations omitted).  The conduct at issue here was not only consistent with the demands of the Fourth Amendment, but it was also far from the type of "deliberate, reckless, or grossly negligent conduct" contemplated by the exclusionary rule.

## III. CONCLUSION

Because the officers acted reasonably in entering to render emergency aid and in conducting a security sweep of the remaining area of the residence, we hold that their actions did not violate the Fourth Amendment.[7]  Accordingly, the trial court did not err in denying the motion to suppress, and we affirm the convictions.

<u>Affirmed.</u>

---

[7] Based on this conclusion, we need not address the trial court's alternative ruling upholding the search pursuant to the inevitable discovery exception.