**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 13, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARTHA ARMIJO, as parent and
best friend of Christopher Armijo
Sanchez,

       Plaintiff - Appellee,

v.

ROB PETERSON; CHARLES HOOK;
DARIO SOLIZ; ERIC SANCHEZ;
MELISSA MOLINA; WALLACE
DOWNS; BRIAN GOODMAN;
GABRIELLA GRAHAM,

       Defendants - Appellants.

No. 09-2114

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 09-CV-00090-RHS-CG)**

---

Jose Coronado, Las Cruces, New Mexico, for Plaintiff - Appellee.

Jared Abrams, Senior Assistant City Attorney for the City of Las Cruces, Las
Cruces, New Mexico, for Defendants - Appellants.

---

Before **KELLY**, **EBEL**, and **BRISCOE**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Defendants-Appellants, several municipal law enforcement officers, appeal from the district court's denial of qualified immunity in this civil rights action under 42 U.S.C. § 1983.

Plaintiff-Appellee Martha Armijo sued the officers for violating the Fourth Amendment when the officers entered and searched her home and detained her son, Christopher Armijo Sanchez. On summary judgment, the district court denied qualified immunity, citing material facts in dispute. Because under any view of the facts the officers did not violate the Fourth Amendment, they deserve qualified immunity. We reverse.

<u>Background</u>

We set forth Plaintiff's version of the facts.

**I.      Gangs and Anonymous Callers Threatened Oñate High School.**

On September 22, 2006, an anonymous caller made two bomb threats to Oñate High School in Las Cruces, New Mexico. Stip. App. at 33-36. During the two months immediately preceding these calls, police officers assigned to the high school had dealt with various gang problems and multiple bomb and shooting threats. Stip. App. at 31-32, 102. Only three days before, an anonymous caller had made a bomb and shooting threat. Stip. App. at 32.

The morning of the threats, two female students predicted them to Oñate High School's principal. Stip. App. at 33. The students told the principal that the

day before they had seen a fight between two rival gangs, the East Siders and the Sureños. Id. According to the students, the gang members said that they would bring guns to school the next day, call in a bomb threat to force the school to evacuate, and open fire on the students or start a gunfight when the students were outside. Id. Although the students did not know the gang members' names, they recognized them from Oñate High School and assumed they referred to that school. Id.

Next, a woman identifying herself as the mother of a boy attending Mayfield High School called the principal of Oñate High School. Stip. App. at 33-34. The woman said that her son told her that a male named Chris would call in a bomb threat to Oñate High School. Stip. App. at 34. She said that Chris was a member of the East Siders gang and that Chris had formerly attended Oñate High School but recently started at Mayfield High School. Id. The principal told the police officer assigned to the school about these tips. Id.

Soon, at 10:35 a.m., a juvenile-sounding male called 911 and made the first bomb threat to Oñate High School. Id. The police officer at the school had spoken to the two female students, who repeated everything to him. Stip. App. at 33. Because the officer viewed the shooting threats to be greater than the bomb threat, he told the principal to place the students under lock-down, so the students could not leave the school. Stip. App. at 35.

When his sergeant arrived, the officer told her that Christopher Armijo was

the only suspect.  Stip. App. at 36-37.  The officer believed that (1) Oñate High School had recently expelled Mr. Armijo and he now attended Mayfield High School, (2) Mr. Armijo was an East Sider, and (3) no other student named Chris had recently transferred between those schools.  Id.

At 11:00 a.m., a juvenile-sounding male made another bomb threat to Oñate High School.  Stip. App. at 35-36.  Like the prior call, this one was from a disconnected cell phone.  Stip. App. at 35.  All cell phones can call 911, even if their service is disconnected, but disconnected phones are harder to trace than functioning phones.  Id.  The officer thought that the person making the threat had seen that the students had not left the building, which frustrated the shooting, and that he was calling a second time to try again.  Stip. App. at 36.

## II.     The Police Searched the House and Detained Mr. Armijo.

The officer then dispatched four other officers to Mr. Armijo's home, which they believed was a gang hangout.  Stip. App. at 37.  Ms. Armijo also lived there, although she was not at home.  Stip. App. at 101, 103.  Three officers knocked on the front door and yelled "Police Department.  Anybody in here?," "Come to the door," and "Let yourself be known" as loudly as they could for two to three minutes.  Stip. App. at 37-38.  When no one answered, one officer then tried the doorknob and found it unlocked.  Stip. App. at 38.

The officers radioed a sergeant at the school.  Id.  From her own knowledge, the sergeant believed Oñate High School had recently expelled Mr.

Armijo, that he now attended Mayfield High School, that expelled students might be angry with the school, and that bomb threats generally were made by angry or problematic students. Stip. App. at 39-40. The sergeant thought Mr. Armijo was the only suspect and authorized entry. Stip. App. at 40.

The officers entered. Id. They searched the home for Mr. Armijo and anyone else within, in part to ensure officer safety. Stip. App. at 41. According to Mr. Armijo, he was sound asleep when the officers entered his bedroom. Stip. App. at 99. Two officers pointed their guns in his face, several yelled at him to get up, one or more pulled him out of bed, one handcuffed him, and one took him out on his porch in his underwear and T-shirt. Id.

While Mr. Armijo was on the porch, the officers searched the home for about five minutes. Id. They questioned him and requested his cell phone, which he provided. Stip. App. at 42. The officers checked the phone and the house's land line. Id. After discovering that neither phone called in the threats, they removed the handcuffs and left. Stip. App. at 42, 99. At most, the officers spent twenty minutes at the home. Stip. App. at 43, 58. When they left, the school was still under lock-down. Stip. App. at 43.

**III.     The District Court Denied the Officers Qualified Immunity.**

The district court held in a brief order that an issue of material fact as to the reasonableness of the officers' conduct precluded summary judgment. Armijo v. Las Cruces Police Officers, No. 09-90 RHS/CEG, slip op. at 3 (D.N.M. Apr. 9,

2009) (Stip. App. at 123). The court did not discuss the factual disputes except one example: "evidence showing Defendants did not have objectively reasonable grounds to believe there was an immediate need to protect lives." Id. The officers appeal the denial of qualified immunity, and other district court decisions.[1] Stip. App. at 125-26.

Listing "the facts that the district court assumed when it denied summary judgment" is "'extremely helpful to a reviewing court.'" Johnson v. Jones, 515 U.S. 304, 319 (1995) (citation omitted). When a district court does not list the material disputed facts, "a court of appeals may have to undertake a cumbersome review of the record to determine" those facts. Id. The better practice is to identify in some way the facts precluding qualified immunity.

Discussion

**I. Jurisdiction**

"[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."

---

[1] The officers (1) appeal the denial of their motion to dismiss based on the applicable statute of limitations, (2) appeal the denial of summary judgment on their state law claims, and (3) argue that the City of Las Cruces bears no municipal liability. Aplt. Br. at 35-42; Stip. App. at 125-26. However, these decisions are not final orders triggering our appellate jurisdiction. 28 U.S.C. § 1291.

Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).  Our jurisdiction is limited to "whether or not certain given facts showed a violation of 'clearly established law.'"  Johnson, 515 U.S. at 311 (citation omitted).  When a district court denies qualified immunity because of a factual dispute, "that finding is not jurisdictionally dispositive on appeal" if the defendants argue that immunity applies even under the plaintiff's version of the facts.  Eidson v. Owens, 515 F.3d 1139, 1145 (10th Cir. 2008).  Relying on Ms. Armijo's version of the facts, we have jurisdiction to consider whether the Defendants have qualified immunity.

## II.    Qualified Immunity

We review *de novo* a district court's decision to deny a summary judgment motion that asserts qualified immunity.  Eidson, 515 F.3d at 1145.  The officers deserve summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

Qualified immunity "protects governmental officials from liability for civil damages insofar as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (citation omitted).  The qualified immunity inquiry has two elements: whether a constitutional violation occurred, and whether the violated right was "clearly established" at the time of the

violation.  Pearson, 129 S. Ct. at 815-16.  We begin with the first element,

whether the officers' entry, search, and detention violated the Fourth Amendment.

Cf. Pearson, 129 S. Ct. at 818.

**III.    Exigent Circumstances Justified the Entry.**

The Fourth Amendment provides that "[t]he right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated." U.S. Const. amend IV.  "[S]earches and seizures

inside a home without a warrant are presumptively unreasonable."  Payton v. New

York, 445 U.S. 573, 586 (1980).  "[W]arrants are generally required to search a

person's home or his person unless 'the exigencies of the situation' make the

needs of law enforcement so compelling that the warrantless search is objectively

reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385,

393-94 (1978) (citations omitted).  The officers bear the burden of establishing

that the threats posed exigent circumstances justifying the warrantless entry.

United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008).

A.    The Scope of the Exigent Circumstances Exception

"One exigency obviating the requirement of a warrant is the need to assist

persons who are seriously injured or threatened with such injury." Brigham City,

Utah v. Stuart, 547 U.S. 398, 403 (2006).  That exigency exists when "(1) the

officers have an objectively reasonable basis to believe there is an immediate

need to protect the lives or safety of themselves or others, and (2) the manner and

-8-

scope of the search is [*sic*] reasonable." United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006). In such an emergency, officers do not need probable cause. Cortez v. McCauley, 478 F.3d 1108, 1124 & n.21 (10th Cir. 2007) (en banc). The Supreme Court illustrated that "police may enter a home without a warrant when they have an objectively reasonable basis for believing that *an occupant* is seriously injured or imminently threatened with such injury." Brigham City, 547 U.S. at 400 (emphasis added).

Here, officers acted to protect not the house's occupants, but the students and staff at a nearby high school. We must decide whether the exigent circumstances exception only justifies warrantless entries into a house to aid *a potential victim in the house*, or if it also justifies warrantless entries into a house to stop *a person or property inside the house* from immediately harming *people not in or near the house*.

The Fourth Amendment's touchstone is reasonableness in the totality of the circumstances. Would-be attackers and victims are frequently not in the same place, yet a requirement that they must be for exigent circumstances to occur could hamper law enforcement and compromise public safety. See Mora v. City of Gaithersburg, Md., 519 F.3d 216, 225-26 (4th Cir. 2008) (deciding that exigent circumstances justified warrantless entry to search the home of a detained man who minutes before threatened to massacre his co-workers); United States v. Bell, 500 F.3d 609, 613-15 (7th Cir. 2007) (finding that exigent circumstances justified

searching a kidnapper's hotel room safe to try to locate the victim).

We therefore hold that the exigent circumstances exception permits warrantless home entries when officers reasonably believe that some actor or object in a house may *immediately* cause harm to persons or property not in or near the house.

In applying this exception, we "'evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers.'" Reeves, 524 F.3d at 1169 (citation omitted). When circumstances objectively justify the officers' actions, we do not consider the officers' subjective motivations. Brigham City, 547 U.S. at 404. Ms. Armijo's arguments about investigatory motivations and about how seriously the officers credited the threats are irrelevant to the extent that they focus on the officers' credibility and personal motivations. Aplee Br. at 13-14, 16, 20-21.

### B. The Threats Posed Exigent Circumstances.

"Exigent circumstances are frequently found when dangerous explosives are involved." United States v. Lindsey, 877 F.2d 777, 781 (9th Cir. 1989). The plausible reports of a bomb and a gun fight posed an emergency. The officers thus had an objectively reasonable basis to believe they immediately needed to protect the lives and safety of those at the high school.

Contrary to Ms. Armijo's assertion, the officers' choice to lock the school down, instead of evacuating it, did not show that no real bomb emergency existed.

-10-

Aplee Br. at 20-21. The officers were between a rock and a hard place. They could either lock down the school, and risk leaving students exposed to a bomb, or evacuate the school, possibly sending the staff and students into gunfire as they exited. The officers made an on-the-ground risk assessment and a split-second judgment call. That the officers could not mitigate both risks simultaneously does not suggest that either was trivial or insubstantial. Both were urgent. We will not second-guess the officers' decision about which risk was greater, nor their actions to deal with these risks. Thomson v. Salt Lake County, 584 F.3d 1304, 1318 (10th Cir. 2009).

Moreover, "[r]easonable belief does not require absolute certainty . . the standard is more lenient than . . . probable cause." United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008). At the same time, a claim of urgent needs or exigent circumstances must have some factual support. Cortez, 478 F.3d at 1124.

Here, the officers had a history of gang problems, two accounts of what might occur, and the bomb threats. Some information provided a link (albeit incorrectly) to Mr. Armijo: his name was "Chris," they believed him to be an East Sider gang member, and he had recently changed schools. The officers could reasonably believe such information implicated Mr. Armijo. Stip. App. at 33-34, 36-40. This case goes beyond what we have held insufficient. E.g., Cortez, 478 F.3d at 1122-23 (the unsubstantiated double-hearsay allegation of a toddler and a

-11-

lack of any imminent danger or destruction of evidence).

Ms. Armijo contends that the officers got their facts wrong. Stip. App. at 85. For example, she argues (1) that Mr. Armijo was not a gang member, (2) that he voluntarily withdrew from Oñate High School, and (3) that he never attended Mayfield High School. Stip. App. at 85, 98-99. Still, the Fourth Amendment evaluates reasonableness based upon what the officers reasonably believed at the time. It does not matter that, in retrospect, information provided to the officers was wrong, and that Mr. Armijo apparently had nothing to do with the threats. Michigan v. Fisher, 130 S. Ct. 546, 549 (2009).

Ms. Armijo disputes that there was an exigent need to enter her house. The officers could have dispelled their suspicions without entering the home, she argues, by checking school records or questioning the informants further. Aplee Br. at 14, 19-20. Still, if the officers acted reasonably, they need not exhaust every avenue of dispelling suspicion. Perhaps more investigation would have been worthy. Then again, given the imminence of the threatened attacks, perhaps any delay would risk too much. The information the officers had was enough for a reasonable belief that exigent circumstances justified entry.

Moreover, the manner of the entry was reasonable. The officers knocked repeatedly and shouted to get attention. Stip. App. at 37-38. Only then did they enter. Stip. App. at 40. They did not force the door. Stip. App. at 38.

-12-

**IV. Exigent Circumstances Justified the Officers' Search**.

After entering, the officers searched the house. Stip. App. at 41. Under Maryland v. Buie, 494 U.S. 325 (1990), a "protective sweep" of a residence to ensure officer safety may take place only incident to an arrest. Id. at 334; United States v. Walker, 474 F.3d 1249, 1254 (10th Cir. 2007). As we discuss below, the officers did not arrest Mr. Armijo, so the search could not have been incident to an arrest. "The sweep may nevertheless have been proper under the exigent-circumstances doctrine" *if* reasonable grounds existed to search to protect the safety of someone besides the officers. Walker, 474 F.3d at 1254. In other words, if they had "a threat to a civilian's safety." Id.

An urgent need to protect those at the high school justified the officers' five-minute search. Stip. App. at 41. The need to find and neutralize those behind the threats made the entry reasonable. Necessarily, then, the circumstances made a search for the suspect reasonable. Entering, but failing to look for the suspect, would do nothing to prevent an attack. The emergency thus justified the search separate and apart from concerns for officer safety.

We do not view the search in a vacuum. The officers reasonably suspected that (1) the threats were part of the back and forth between rival gangs, and (2) that Mr. Armijo was a gang member. From this, a reasonable officer could suspect that Mr. Armijo might have accomplices.

Even after they found Mr. Armijo, the officers could have reasonably

believed that sweeping for accomplices would prevent Mr. Armijo from evading them. Or, they could suspect that these accomplices would also threaten the school. After all, the officers thought Mr. Armijo might start a gunfight and detonate explosives. These offenses cry out for concerted action. Although we draw all reasonable inferences in Ms. Armijo's favor, the evidence showing the reasonableness of the officers' search of the home for dangerous persons is so apparent that to ignore it would be unreasonable.

Such a search must be "'strictly circumscribed by the exigencies which justify its initiation.'" Mincey, 437 U.S. at 393 (quoting Terry v. Ohio, 392 U.S. 1, 25-26 (1968)). The officers satisfactorily "confined the search to only those places inside the home where an emergency would reasonably be associated," that is, where the perpetrators could be. Najar, 451 F.3d at 720.

**V.  Exigent Circumstances Supported Detaining Mr. Armijo**.

The parties suggest that Mr. Armijo's detention was not an arrest, but an investigative detention under Terry v. Ohio, 392 U.S. 1, 20-21 (1968). Aplt. Br. at 23-25; Aplee Br. at 19. Under Terry, "[a]n officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." Cortez, 478 F.3d at 1115 (internal quotation marks and citation omitted).

**A.  Exigent Circumstances May Justify Intermediate Seizures.**

The investigative detention category is shorthand for a broad range of

seizures amounting to more than consensual encounters but less than arrests. Id. Terry's reasonable, articulable suspicion standard governs these diverse intrusions. Investigative detentions are permissible in some circumstances but not in others.

Absent exigent circumstances and probable cause, or a warrant, officers may not enter a home and seize an individual for routine investigatory purposes, no matter whether the seizure is an investigatory stop or an arrest. Payton, 445 U.S. at 590. In that sense, Terry stops have no place in the home. Harman v. Pollock, 586 F.3d 1254, 1262 & n.2 (10th Cir. 2009); Reeves, 524 F.3d at 1166-67.

When officers search a house pursuant to a warrant, they may detain an occupant. Michigan v. Summers, 452 U.S. 692, 696, 703-05 (1981). Likewise, when officers lawfully arrest one occupant, officers may stop co-occupants as part of a Buie sweep. United States v. Maddox, 388 F.3d 1356, 1361-63 (10th Cir. 2004). And, just as exigent circumstances permit a warrantless home entry, emergencies may justify a warrantless seizure in the home. Kirk v. Louisiana, 536 U.S. 635, 638 (2002); Payton, 445 U.S. at 587-88; Reeves, 524 F.3d at 1166-67; Walker, 474 F.3d at 1252-53.

B.    The Emergency Justified Mr. Armijo's Intermediate Detention.

The officers focused on the emergency and detained Mr. Armijo for the few minutes necessary to confirm or dispel their suspicions. Terry, 392 U.S. at 28;

-15-

Stip. App. at 41-42, 99.  When the phones supported Mr. Armijo's innocence, they left.  Stip. App. at 42-43, 99.  They did not question him about anything else.  Terry, 392 U.S. at 30.  This is reasonable.

First, we agree with the parties that an investigative detention took place, notwithstanding that it occurred in the home.  See Cortez, 478 F.3d at 1123 (seizure of Tina Cortez while in her home).  The encounter was non-consensual, but it did not amount to an arrest.  Although the officers displayed their guns, yelled, and took Mr. Armijo outside, the officers neither told Mr. Armijo that he was under arrest, nor placed Mr. Armijo in their patrol car, nor moved him to the police station, nor read him his Miranda rights.  Stip. App. at 99.  The seizure thus was an intermediate intrusion.

Second, exigent circumstances supported the seizure.  The dual threats to the high school posed an emergency.  To incapacitate the person suspected of making the threats, the officers needed to detain Mr. Armijo while they investigated further.  Of course, the initial entry and brief search were based upon an emergency, so the seizure did not stem from an ordinary investigation.  Cf. Payton, 445 U.S. at 587-88.

Third, based on informants and their own knowledge, the officers had reasonable articulable suspicion that Mr. Armijo might be involved.  The tips pointed only at him.  Together, these factors remove this case from the strict rules governing warrantless entries enabling ordinary investigative seizures, and places

it within the more flexible realm of seizures supported by exigent circumstances.

In short, if the simultaneous threats justify the entry and the search, they also justify the object of those actions: neutralizing the threat. They officers had to stop the suspect immediately or risk the attacks. It would be unreasonable to permit the officers to enter and search, but forbid them from briefly detaining the object of their quest. That the officers ultimately cleared Mr. Armijo of suspicion does not alter their actions' reasonableness. Cf. Illinois v. Wardlow, 528 U.S. 119, 126 (2000).

## VI.    The Dissent Misplaces Its Concerns.

The dissent would hold that we lack jurisdiction because of factual disputes. Yet, we have jurisdiction when immunity applies under a plaintiff's version of the facts. E.g., McBeth v. Hines, —F.3d —, 2010 WL 762189 at *3 (10th Cir. 2010); Eaton v. Meneley, 379 F.3d 949, 955 (10th Cir. 2004); Johnson v. Martin, 195 F.3d 1208, 1214 (10th Cir. 1999).

The dissent further argues that a jury should resolve whether exigent circumstances existed. Dissent Op. at 8-15. It suggests that because the officers did not evacuate the school, a jury could conclude that the officers viewed the bomb threats solely as a ruse to evacuate the school rather than as threats. Id. at 14-15. According to the dissent, this calls into question whether the officers had an objectively reasonable basis for entering and searching Ms. Armijo's home. Id. Rather than acting as they did, the officers could have surveilled the school

-17-

and Ms. Armijo's house while either getting a warrant or obtaining consent to enter the home.  Id. at 15.

Still, the officers acted within the wide range of objectively reasonable choices.  Faced with simultaneous risks and incomplete information, the officers chose to lock the school down because they judged that evacuation posed a greater risk to the high school.  Inferring from this that the officers viewed the bomb threat as trivial is unreasonable.

Nor were the officers required to try to dispel their suspicion and further verify their information.  Contra id. at 12.  The Fourth Amendment does not require officers to use the least restrictive means to investigate a threat.  If officers act reasonably, it does not require them to do more.  Phillips v. James, 422 F.3d 1075, 1080 (10th Cir. 2005).

According to the dissent, reasonable minds could differ on the seriousness of the emergency, and so this case requires a jury trial.  Dissent Op. at 1-2.  That misstates the standard.  In this context, a factual dispute goes to a jury if, under Plaintiff's facts, no reasonable officer could have believed that the emergencies justified their actions.  Najar, 451 F.3d at 718.  For the reasons stated, even under the Plaintiff's version of the facts, reasonable officers could have believed the situation justified the response that occurred.

The dissent alternatively posits that, no matter whether exigent circumstances existed, the officers needed probable cause to enter the home.

-18-

Dissent Op at 2, 7 n.1, 8-9, 11 n.2, 18.  Not so.  Officers do not need probable cause if they face exigent circumstances in an emergency.  <u>Brigham City</u>, 547 U.S. at 402-07; <u>Cortez</u>, 478 F.3d at 1124 & n.21; <u>Najar</u>, 451 F.3d at 718.

The dissent next argues that any sweep is without support because our precedents permit protective sweeps only when incident to an arrest.  Dissent Op. at 16-17.  Although this court has not explicitly endorsed a search in non-arrest emergencies, an objectively reasonable officer could conclude a five-minute search of the house to find and neutralize any accomplices is reasonable under these exigent circumstances.  <u>Walker</u>, 474 F.3d at 1254.[2]  After all, the officers were investigating threats of a planned gunfight and detonating a bomb—offenses that probably involve more than one person.

Last, the dissent cites cases forbidding warrantless, ordinary investigatory stops and arrests in the home.  Dissent Op. at 18-23.  Those precedents do not forbid warrantless entries and stops during emergencies.  They hold that the exigent circumstances exception applies if officers show more than the usual need to seize a suspect or preserve evidence.  <u>Kirk</u>, 536 U.S. at 638; <u>Payton</u>, 445 U.S. at 587-88; <u>Reeves</u>, 524 F.3d at 1166-67.

Moreover, this court sitting en banc has held that investigative detentions

---

[2]  Of course, it also was reasonable for those officers to sweep the house for their own protection — even though they did not at that moment plan to arrest an occupant.  But we need not rely on this rationale because exigent circumstances (public safety) support what was done here.

may occur in the home, provided (1) that exigent circumstances exist and (2) that officers have reasonable suspicion.  See Cortez, 478 F.3d at 1123.  Here, officers entered and seized Mr. Armijo not during a routine investigation but in an emergency.  The dissent's concerns ultimately return to whether exigent circumstances existed.  An emergency existed and, paired with sufficient factual suspicion, they make Mr. Armijo's detention reasonable.  Contrary to the dissent, this holding does not give officers carte blanche to ignore warrant requirements in non-emergency, routine investigations.  Dissent Op. at 23.

Because the officers did not violate the constitutional rights of the Plaintiff, the officers deserve qualified immunity.

REVERSED.

09-2114, <u>Armijo v. Peterson, et al.</u>

**BRISCOE**, J., dissenting:


I respectfully dissent. It is well established that we may take "interlocutory jurisdiction over denials of qualified immunity at the summary judgment stage to the extent that they turn on an issue of law." <u>Fogarty v. Gallegos</u>, 523 F.3d 1147, 1153 (10th Cir. 2008) (quotation, citations and alteration omitted). "Under this limited jurisdiction, we may review the district court's abstract legal conclusions, such as whether the law was clearly established at the time of the alleged infraction." <u>Id.</u> at 1153-54. We may not take jurisdiction at the interlocutory stage, however, over appeals that challenge the district court's "factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." <u>Id.</u> at 1154.

By asserting jurisdiction over this appeal, the majority implicitly, but erroneously, concludes, contrary to the conclusion reached by the district court, that reasonable minds could <u>not</u> differ with regard to whether the facts leading up to the officers' entry into plaintiff's home gave rise to exigent circumstances. Because I agree with the district court's conclusion that the evidence presented by the parties created genuine issues of material fact that precluded the entry of summary judgment in favor of defendants on qualified immunity grounds, I would dismiss the appeal for lack of jurisdiction. <u>Gross v. Pirtle</u>, 245 F.3d 1151, 1157

(10th Cir. 2001) ("If we determine the district court's conclusion rests on findings of evidence sufficiency, we must dismiss for lack of jurisdiction.").

In addition to the jurisdictional issue, the majority opinion is erroneous in three key respects. First, the majority erroneously extends the holding in Brigham City v. Stuart, 547 U.S. 398 (2006), which authorizes "law enforcement officers [to] enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," id. at 403, to circumstances where "officers reasonably believe that some actor or object in a house may *immediately* cause harm to persons or property not in or near the house," Maj. Op. at 10 (italics in original). In doing so, the majority effectively dispenses not only with the warrant requirement, but also with the critical requirement of probable cause, for what, at bottom, is simply "the paradigmatic entry into a private dwelling by . . . law enforcement officer[s] in search of the fruits[,] instrumentalities[, or perpetrators] of crime." Michigan v. Tyler, 436 U.S. 499, 504 (1978). For exigency to justify a warrantless entry into a dwelling in situations where, as here, law enforcement officers are seeking to detain and question a suspect, it must be coupled with probable cause. Second, the majority errs in concluding that the defendants' search of plaintiff's home was justified by the protective sweep doctrine. Not only does Tenth Circuit precedent fail to support the extension of the protective sweep doctrine to non-arrest situations involving exigent circumstances, defendants have not suggested or produced any

-2-

evidence to support a finding that a protective sweep was warranted in this case. Third, the majority seriously errs in concluding that the defendants' in-home seizure of Chris Armijo was justified under Terry v. Ohio, 392 U.S. 1 (1968).

I

The parties' summary judgment pleadings reveal the following relevant facts. At approximately 10:30 a.m. on September 22, 2006, an anonymous juvenile male telephoned MVRDA, the agency that handled 911 calls for the Las Cruces, New Mexico, Police Department, and advised that a student at Oñate High School (OHS) was carrying a bomb and a firearm in a backpack. App. at 32, 56. MVRDA was unable to trace the call. Id. at 32. The call represented the third or fourth bomb threat that had been made regarding OHS in the span of a few days. Id. at 56. On at least one of the previous occasions, the police evacuated students from OHS and searched student backpacks for bombs. Id. at 32. No bombs were found. Id.

Charles Hook, a Las Cruces police officer assigned to OHS as a School Resources Officer, directed the principal of OHS, Joyce Aranda, "to place the students in lockdown, that is, not allow them to leave the school." Id. at 72. In making this decision, Hook was not only aware of the circumstances of the previous bomb threats, he was also privy to two pieces of additional information. First, he had spoken with two female students at OHS earlier that morning who reported having overheard a conversation the day before between rival gang

-3-

members "stat[ing] that they would call in a bomb threat and, when students evacuated, there would be either a gun fight between gangs or a drive-by shooting." Id. at 71. Second, earlier that morning Principal Aranda had received a telephone call "from a woman who identified herself as the mother of a son who attend[ed] Mayfield High School." Id. "The woman told Principal Aranda that [a] boy named 'Chris,'" a student at Mayfield High School who had previously attended OHS, "intended to call in a bomb threat to [OHS] that day." Id. at 71-72. According to Hook, he "viewed the threat of a gunfight between rival gangs or a drive-by shooting perpetrated by one gang against another . . . as a greater threat than the bomb threat." Id. at 72.

At approximately 11:00 a.m. on September 22, 2006, MVRDA received another call, again from an anonymous juvenile male, stating that a bomb had been placed at OHS. Id. at 72. Upon learning of this second call, Hook "concluded that the person who made the bomb threat was observing the [OHS] building, noticed that [it] was not being evacuated[,] and therefore made a second attempt to have the building evacuated by calling in the second bomb threat." Id. at 72-73. Consequently, Hook continued to stand by his earlier direction that the school be placed in lockdown status. Shortly after learning of the second call, Hook determined that [a former OHS student named] Chris Armijo . . . was the only possible suspect in regards to making the bomb threats." Id. at 73. According to Hook, Chris Armijo had "recently been expelled" from OHS, "had

-4-

begun attending Mayfield High School and was known to be a member of the East Siders gang." Id. Hook "went to the front office of [OHS] and obtained Chris Armijo's address." Id. Hook then "called th[at] address to other officers over the radio." Id.

Robert Peterson, a Las Cruces police officer assigned to the "Targeting Neighborhood Threats Unit," "proceeded to the Armijo residence . . . in Las Cruces." Id. at 56. Peterson and two other officers (Wallace Downs and Melissa Molina) arrived at the Armijo residence approximately twenty minutes after the second bomb threat was received. Id. The intention of Peterson and the other officers was to interview Chris Armijo "and determine whether or not his cell phone matched that of the individual who called in the bomb threat[s]." Id. Peterson knocked and announced at the front door of the Armijo residence for approximately "two to three minutes." Id. "After knocking for two to three minutes" with no one answering, Peterson "tried the doorknob" and discovered that the front door of the residence "was unlocked." Id. at 57. Peterson notified his sergeant, Gabriella Graham, "by radio that the door was unlocked." Id.

Graham authorized Peterson, Downs and Molina to enter the Armijo residence. Id. According to Graham, "[t]he basis for [her] giving permission for the officers to enter the home, as opposed to obtaining a search warrant or waiting for an occupant to emerge or return, was exigent circumstances." Id. at 62. More specifically, Graham concluded that a warrantless entry was reasonable due to the

fact that OHS "was still under lockdown, with the combined threat of a bomb inside the school and a drive-by shooting outside of it and the fact that [they] had identified a probable suspect . . . ." Id. at 63.

Peterson, Downs and Molina entered the Armijo residence. Id. at 57. As they did so, Peterson loudly yelled various phrases such as "'Police Department,' 'Show Yourself,' and 'Let Yourself Be Known.'" Id. The officers proceeded to conduct a protective sweep of the residence. Id.

The parties differ as to the ensuing events. Peterson alleges that Chris Armijo came out of a bedroom and stated that he had been asleep, id., the officers then proceeded to interview Armijo and examine his cell phone, id. at 58, no search of the home was conducted, and the episode lasted approximately twenty minutes. Id.

According to Chris Armijo, he "was awoken by several police officers yelling and screaming at [him], and at least two of those officers were pointing a gun at [him]." Id. at 99. Chris Armijo further alleges that "[o]ne or more police officers pulled [him] out of bed" and "[o]ne of the officers handcuffed [him] and took [him] outside to the porch" while the other officers went back inside the house for approximately five minutes. Id.

It is uncontroverted that the police ultimately concluded that Chris Armijo's cell phone did not match the phone number that was used to make the two bomb threats, and thus they concluded Chris Armijo was not responsible for

making the two bomb threats.

II

In their motion for summary judgment, defendants argued they were entitled to qualified immunity as to plaintiff's § 1983 claims because they "were facing exigent circumstances which left them with no choice but to enter the home without a warrant in order to search for" Chris Armijo. Id. at 48. In her response to defendants' summary judgment motion, plaintiff argued, in pertinent part, that "there [we]re disputed material facts" that prevented the grant of summary judgment in favor of defendants. Id. at 82. In particular, plaintiff argued that a reasonable jury could find that defendants lacked an objectively reasonable basis for believing there was an immediate need to enter her home in order to protect their lives or the lives of others. Id. at 86-89.

When the district court subsequently denied defendants' motion for summary judgment, it stated, in pertinent part:

> Having considered the parties' arguments and evidence, the Court finds that material facts underlying a determination of whether Defendants' conduct was reasonable under the circumstances are in dispute. [Footnote: For example, although Defendants contend that the entry into Plaintiffs' home was justified by exigent circumstances, Plaintiffs point to evidence showing Defendants did not have objectively reasonable grounds to believe that there was an immediate need to protect lives.] Thus, the Court is unable to conclude whether Defendants' warrantless entry into Plaintiffs' home was reasonable. Summary judgment on qualified immunity grounds is not appropriate under these circumstances. See Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (explaining that summary judgment based on qualified immunity is properly denied

-7-

where there exist unresolved factual disputes relevant to the immunity analysis) (citation omitted); see also Thomas v. Roach, 165 F.3d 137, 143 (6th Cir. 1999) (stating that summary judgment on qualified immunity is not appropriate where material facts determinative of reasonableness are in dispute). Consequently, Defendants' motion for summary judgment on Plaintiffs' § 1983 claims will be denied.

Id. at 123-24.

III

Casting aside the district court's analysis, the majority concludes "we have jurisdiction to consider whether the Defendants have qualified immunity" by "[r]elying [solely] on Ms. Armijo's version of the facts . . . ." Maj. Op. at 7. Although I do not question our authority to do so, I disagree that plaintiff's version of the facts reveals no constitutional violations. Indeed, I am of the view that the majority has misanalyzed each of the constitutional violations alleged by plaintiff.

*a) Exigent circumstances*

"[P]rivate dwellings" are "ordinarily afforded the most stringent Fourth Amendment protection." United States v. Martinez-Fuerte, 428 U.S. 543, 561 (1976). Consequently, a warrantless entry into a home by a government official is "presumptively unreasonable." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation marks and citations omitted); see Michigan v. Tyler, 436 U.S. 499, 506 (1978) (noting that "[s]earches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth

Amendment."). "[B]ecause," however, "the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City, 547 U.S. at 403. In particular, the Supreme Court has recognized several types of exigencies that may "obviat[e] the requirement of a warrant . . . ." Id. (citing cases).

Typically, where criminal law enforcement officers are involved, any such exigency must be coupled with probable cause. See Kirk v. Louisiana, 536 U.S. 635, 638 (2002) (per curiam) ("[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."). That is because the usual purpose of criminal law enforcement officers entering a home is to either seize a suspect or to search for incriminating evidence. Cf. Mincey v. Arizona, 437 U.S. 385, 393 (1978) ("[A] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation . . . .'") (quoting Terry v. Ohio, 392 U.S. 1, 25-26 (1968)). If, however, the exigency motivating the warrantless entry by criminal law enforcement officers "is the need to assist persons who are seriously injured or threatened with such injury," Brigham City, 547 U.S. at 403, i.e., so-called "emergency situation[s]," id. at 402, there is no accompanying probable cause requirement. Cortez v. McCauley, 478 F.3d 1108, 1124 n.21 (10th Cir. 2007).

Applying these principles to the facts alleged by plaintiff, the majority concedes that no one inside plaintiff's home was "seriously injured or threatened

-9-

with such injury." <u>Brigham City</u>, 547 U.S. at 403; <u>see</u> Maj. Op. at 9 ("Here, officers acted to protect not the house's occupants . . . ."). Rather than rejecting the applicability of <u>Brigham City</u>'s emergency situation exception and instead considering whether the facts alleged by plaintiff fall within the typical exigent circumstances exception (with its requirement of probable cause), the majority presses forward and concludes, remarkably, that the emergency situation exception recognized in <u>Brigham City</u> "also justifies warrantless entries into a house to stop *a person or property inside the house* from immediately harming *people not in or near the house*." Maj. Op. at 9 (italics in original).

The majority's new exception, however, bears little, if any, relation to the emergency situation exception recognized in <u>Brigham City</u>. Whereas <u>Brigham City</u>'s exception allows law enforcement officials to enter a home without a warrant in order to physically aid or protect a victim or potential victim located inside, the majority's new exception authorizes law enforcement officers to enter a home without a warrant in order to seize a suspected criminal. In other words, the focus of the exception shifts from aiding a victim or protecting a potential victim to seizing a potential criminal suspect. But the most troubling aspect of the majority's new exception is that, by purportedly extending <u>Brigham City</u>, it simultaneously dispenses with the requirement of probable cause. Thus, under the majority's newly recognized exception, law enforcement officials may now enter a home without a warrant or probable cause and presumably seize an

-10-

occupant thereof so long as they have some type of "objectively reasonable basis," Maj. Op. at 8, short of probable cause, for believing that such occupant poses an immediate threat of harm to "people not in or near the house," id. at 9.

In my view, the only constitutionally permissible basis for defendants' warrantless entry into plaintiff's home would be a combination of "probable cause plus exigent circumstances . . . ."[1]  Kirk, 536 U.S. at 638.  More specifically, defendants' warrantless entry into plaintiff's home could survive Fourth Amendment scrutiny only if defendants had a particularized and objective basis for suspecting that Chris Armijo was responsible for the bomb threats, United States v. Ledesma, 447 F.3d 1307, 1316 (10th Cir. 2006) (describing probable cause requirement), and the urgency of the situation was "'so compelling that the warrantless [entry] [wa]s objectively reasonable under the Fourth Amendment.'" Brigham City, 547 U.S. at 403 (quoting Mincey, 437 U.S. at 393-94); see United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008) (indicating that exigent circumstances exist when "'the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of . . . others . . . .'") (quoting United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006)).

---

[1] Curiously, the majority acknowledges these principles not in its discussion of the defendants' warrantless entry into plaintiff's home, but rather in its discussion of the defendants' seizure of Chris Armijo.  Maj. Op. at 15.

-11-

Significantly, however, defendants have never argued that they had probable cause. And, even if they had, I would conclude that genuine issues of material fact exist that preclude the entry of summary judgment on the issue of probable cause. See generally Thomson v. Salt Lake County, 584 F.3d 1304, 1326 n.2 (10th Cir. 2009) (noting that genuine issues of material fact regarding the existence of probable cause can exist that preclude the entry of summary judgment on qualified immunity grounds).

As for the question of "whether exigent circumstances existed to excuse a warrantless [entry]," that too "is a question for the jury provided that, given the evidence on the matter, there is room for a difference of opinion." Ingram v. City of Columbus, 185 F.3d 579, 587 (6th Cir. 1999); cf. Bruner v. Baker, 506 F.3d 1021, 1028 (10th Cir. 2007) (noting that "the question whether an officer had probable cause for an arrest" is a proper issue for the jury "'if there is room for a difference of opinion.'") (quoting DeLoach v. Bevers, 922 F.2d 618, 623 (10th Cir. 1990)). In moving for summary judgment, defendants in this case argued that they "were facing exigent circumstances," in particular "an immediate need to protect lives," "which left them with no choice but to enter [plaintiff's] home without a warrant in order to search for [Chris Armijo]." App. at 48. Plaintiff did not seriously dispute the portion of defendants' statement of facts describing the general events that preceded the officers' warrantless entry into her home. She did, however, dispute whether those facts created exigent circumstances:

-12-

The Defendants allege that because they were concerned about the bomb scare, they had to immediately find [Chris Armijo] and question him. Yet they apparently did not believe the bomb scare was legitimate. Instead of evacuating the school in order to secure the safety of the students, they kept the school in lockdown. The students were required to remain inside the school instead of outside. It is incredible to believe the Defendants believed there was a bomb in the school when SRO Hook kept the students inside. Since the Defendants apparently did not believe the bomb threat was real, they had sufficient time to further their investigation. They could have called Mayfield High School to confirm whether [Chris Armijo] was a student [there]. They could have called [his] mother to ask for consent to enter and search her home for [him]. When Mrs. Armijo learned that the police were at her home, she immediately left work to get home. When she arrived and found no police, she called the police department to inquire about why the police were at her home. She wanted to know what had happened. There is no reason to believe that she would not have cooperated with the police had they requested permission to enter her home. They could have and most likely did cordon off the school entrances, so that no one could come in and no one could go out.

App. at 87-88.

Although the district court agreed with plaintiff that reasonable jurors could differ on whether the evidence gave rise to exigent circumstances, the majority summarily rejects that position on the grounds that "[p]laintiffs' arguments about investigatory motivations and about how seriously the officers credited the threats are irrelevant." Maj. Op. at 10. According to the majority, the Supreme Court's decision in <u>Brigham City</u> indicates that "[w]hen circumstances objectively justify the officers' actions, we do not consider the officers' subjective motivations." Maj. Op. at 10.

Although I agree that <u>Brigham City</u> requires us to ignore any subjective

-13-

"investigatory motivations," I disagree that it precludes us from considering "how seriously the officers credited the threats . . . ." Id. Surely we can look at the objective information the officer had and also look at the actions they took in response to that information. In Brigham City, the defendants argued that the challenged warrantless entry and search was unreasonable because, in part, the entering "officers were more interested in making arrests than quelling violence." 547 U.S. at 404. The Supreme Court rejected that argument, holding that "[t]he officer's subjective motivation [for making a warrantless entry] [wa]s irrelevant." Id. Here, in contrast, plaintiff argues, and I agree, that a relevant factor, indeed perhaps the key factor, in assessing whether the officers had an objectively reasonable basis to believe there was an immediate need to enter plaintiff's home in order to protect the lives or safety of the students at the high school was the perceived legitimacy of the bomb threats. As plaintiff noted in her response to defendants' summary judgment motion, the actions of the defendants, particularly Officer Hook, in placing the high school in "lock-down" mode rather than evacuating the students clearly suggest defendants did not view the bomb threats as legitimate, but rather as a ruse. Such a conclusion is bolstered by the uncontroverted evidence indicating that the school had, shortly prior to the day at issue, received two or three false bomb threats.

In turn, I fully agree with plaintiff and the district court that, in light of this evidence, a jury could reasonably find that the defendant officers lacked an

-14-

objectively reasonable basis for believing there was an immediate need to enter plaintiff's home in order to protect the lives or safety of the students. To be sure, the evidence is uncontroverted that defendants took seriously the possibility that the bomb threats were intended as a ruse to evacuate the students in order to facilitate a drive-by shooting or other gang-related violence. But defendants fail to explain, given the fact the students were locked down safely inside the school, why it was necessary to immediately enter plaintiff's home without a warrant.[2] As I see it, reasonable jurors could conclude that a combination of other tactics (e.g., simultaneously surveilling both the high school and plaintiff's house) would have sufficed to keep any threat in check until a search warrant for plaintiff's home could have been obtained (or, as plaintiff suggests, until the defendants could have contacted plaintiff and asked for consent to enter her home). As a result, I believe the proper approach was the one adopted by the district court, i.e., denying defendants' motion for summary judgment and allowing plaintiff's claims regarding the constitutionality of the warrantless entry and ensuing search and seizure to proceed further.

---

[2] Although the majority characterizes the "threatened attacks" as "imminen[t]," Maj. Op. at 12, the uncontroverted evidence suggests otherwise. As I have noted, the evidence clearly indicates that the defendants did not view the bomb threats as credible, but rather as a ruse for evacuating the high school and facilitating some other type of violent attack. Further, reasonable jurors could conclude that defendants' actions in locking down the high school prevented any such other attacks from becoming imminent.

*b) The search of the house*

According to plaintiff's version of the facts, the defendant officers handcuffed Chris Armijo, removed him to the porch of the home, and then searched the home for approximately five minutes. Purportedly accepting these facts as true[3], the majority characterizes, and ultimately blesses, the search of the home as a protective sweep. This conclusion is without legal support.

In <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990), the Supreme Court explained that "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Since <u>Buie</u>, some circuits have extended the protective sweep doctrine to non-arrest situations, <u>so long as the officers lawfully entered the residence at issue</u>. <u>E.g.</u>, <u>United States v. Caraballo</u>, 595 F.3d 1214, 1224 (11th Cir. 2010) (citing cases).

Although the majority's opinion suggests that this circuit has likewise extended the protective sweep doctrine, that conclusion is far from clear. Between <u>Buie</u>'s issuance in 2000 and December 2006, this court repeatedly

---

[3] In discussing the search of the house, the majority draws inferences that are neither favorable to plaintiff nor even argued by defendants. For example, the majority infers, based on the defendants' suspicions that Chris Armijo was a gang member and that the bomb threats "were part of the back and forth between rival gangs," that "a reasonable officer could suspect that [Chris] Armijo might have accomplices" inside plaintiff's home. Maj. Op. at 13.

-16-

refused to extend the protective sweep doctrine beyond situations involving arrests. See United States v. Torres-Castro, 470 F.3d 992, 997 (10th Cir. 2006) (authorizing protective sweep that occurred prior to arrest of defendant, but recognizing and adhering to the longstanding Tenth Circuit rule that "protective sweeps must be performed incident to an arrest"). In January 2007, a panel of this court suggested, notwithstanding existing Tenth Circuit precedent, that "exigent circumstances may have justified a search of [the defendant's] home as a sweep for potential victims," and remanded the case to the district court for further consideration of that issue. United States v. Walker, 474 F.3d 1249, 1254 (10th Cir. 2007). At no point since the remand in Walker has this court revisited the suggestion made in Walker.

Even assuming, for purposes of argument, that Walker extended the protective sweep doctrine to non-arrest situations involving exigent circumstances, the doctrine has no applicability to the case at hand. To begin with, there has been no suggestion by defendants, let alone the production of any evidence that would support a reasonable factual finding, that the officers at plaintiff's home were concerned that individuals other than Chris Armijo were in the house and posed some type of threat. Indeed, defendants deny having conducted any sweep or other search of the home. Further, even if defendants had argued the necessity of performing a protective sweep, reasonable persons could conclude that the length of the purported search, i.e., five minutes,

-17-

exceeded the time necessary to accomplish the "cursory visual inspection" that defines a true "protective sweep." Buie, 494 U.S. at 327. Finally, although the majority concludes that defendants "satisfactorily confined the search to only those places inside the home where an emergency would reasonably be associated," Maj. Op. at 14 (internal quotations and citation omitted), the truth of the matter is that we simply don't know at this point what the scope of the alleged search was. As noted, defendants wholly deny conducting any search of plaintiff's home. In contrast, Chris Armijo's affidavit, submitted by plaintiff in opposition to defendants' motion for summary judgment, indicates that "[o]ne or more police officers pulled [him] out of bed" and "[o]ne of the officers handcuffed [him] and took [him] outside to the porch" while the other officers went back inside the house for approximately five minutes. App. at 99. Thus, genuine issues of material fact exist as to the scope of the alleged search.

*c) The seizure of Chris Armijo*

Plaintiff alleges that Chris Armijo was illegally seized by the defendant officers when he was handcuffed, removed to the porch of the home, and detained while the officers conducted a search of his home. Astoundingly, the majority concludes that this was not an arrest, but rather a permissible "stop" under Terry.[4]

---

[4] To the extent the parties in this case suggest that the seizure of Chris Armijo was a Terry stop, they are obviously mistaken, and we are in no way bound by their positions. E.g., Harsco Corp. v. Renner, 475 F.3d 1179, 1190 (10th Cir. 2007) ("To be sure, this court is not bound by the parties' stipulations

-18-

At issue in <u>Terry</u> was the constitutionality of a police officer's "on-the-street stop, interrogat[ion] and pat down for weapons" of individuals he had observed and suspected of planning to rob a nearby store. 392 U.S. at 12. In addressing these issues, the Court noted it was "deal[ing] . . . with an entire rubric of police conduct — necessarily swift action predicated upon the on-the-spot observations of the officer on the beat — which historically ha[d] not been, and as a practical matter could not be, subjected to the warrant procedure." 392 U.S. at 20. Focusing first on the officer's decision to approach and interrogate the men, the Court concluded the officer was "discharging" a "legitimate investigative function," i.e., he approached the men "for purposes of investigating possibly criminal behavior even though there [wa]s no probable cause to make an arrest." <u>Id.</u> at 22. As for the officer's pat down of one of the individuals in particular, the Court "conclude[d] that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." <u>Id.</u> at 27. In other words, the Court stated, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety

_____

regarding questions of law . . . .").

or that of others was in danger." Id.

Not surprisingly, we recently emphasized that "Terry generally does not apply within one's home." Harman v. Pollock, 586 F.3d 1254, 1262 n.2 (10th Cir. 2009). In doing so, we cited with approval the Ninth Circuit's oft-repeated explanation that "Terry's twin rationales for a brief investigatory detention — the evasive nature of the activities police observe on the street and the limited nature of the intrusion — appear to be inapplicable to an encounter at a suspect's home." United States v. Washington, 387 F.3d 1060, 1067 (9th Cir. 2004) (citation omitted). In other words, we recognized, in pertinent part, the longstanding principle that the reasonable expectation of privacy in one's home is far greater than the expectation of privacy one has in activities conducted in public. E.g., United States v. Knotts, 460 U.S. 276, 281 (1983) ("A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.").

Although the majority pays lip service to Harman, it nevertheless asserts that "when officers search a house pursuant to a warrant, they may detain an occupant if they have reasonable articulable suspicion under Terry." Maj. Op. at 15. But the sole authority cited by the majority, Michigan v. Summers, 452 U.S. 692 (1981), simply does not support that proposition. In Summers, the question at issue was the constitutionality of the detention of an individual who was observed leaving a home that was about to be searched pursuant to a warrant.

The detention began outside the home and continued, inside the home, while the police searched the premises. Nowhere in Summers did the Court indicate that the detention was authorized by Terry. Rather, the Court explained that "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home." Id. at 704-05. "Thus, for Fourth Amendment purposes, [the Court] h[e]ld that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. at 705.

The majority also suggests that "[j]ust as exigent circumstances permit a warrantless home entry, emergencies justify a stop in the home." Maj. Op. at 15. But again, the sole authority cited by the majority in support of this proposition, i.e., Walker, 474 F.3d at 1252-53, says nothing of the sort. To be sure, Walker notes that "[a] warrantless entry into a home may be justified . . . in certain exceptional circumstances," and proceeds to cite three Supreme Court cases that either support the general principle or provide examples of circumstances in which warrantless entry is justified. Id. (citing Coolidge v. New Hampshire, 403 U.S. 443, 474-75 (1971); Brigham City, 547 U.S. at 403; Georgia v. Randolph, 547 U.S. 103, 116 n.6 (2006)). But nowhere does Walker remotely suggest, let

-21-

alone hold, that "emergencies justify a stop in the home." Maj. Op at 15.

Consequently, the majority's suggestion that there are "strict rules governing

warrantless entries enabling ordinary investigative seizures," id. at 16, but "more

flexible" rules governing "seizures supported by exigent circumstances," id. at 17,

is simply wrong.

At bottom, it is absurd to suggest that the defendant officers' seizure of

Chris Armijo was justified under Terry. The undisputed evidence in this case

indicates that the defendant officers, after conducting an initial investigation,

believed that Chris Armijo was responsible for the two bomb threats and they

proceeded to plaintiff's home intending to interview him and examine his cell

phone. It is further undisputed that the defendant officers did not take the time to

obtain a search warrant for plaintiff's home or an arrest warrant for Chris Armijo.

Consequently, under clearly established federal law, the only way they could

enter plaintiff's home was by consent, which did not occur, or by way of a

combination of probable cause and exigent circumstances. E.g., Kirk, 536 U.S. at

638; Payton, 445 U.S. at 587-88; United States v. Reeves, 524 F.3d 1161, 1166

(10th Cir. 2008) (noting that "Payton's protections apply to all Fourth

Amendment seizures of persons inside their homes," and that "labeling an

encounter in the home as either an investigatory stop or an arrest is meaningless

because Payton's requirements apply to all seizures").

Unfortunately, the majority ignores these well-established principles and

reaches a conclusion that, until rightly overturned, threatens to undermine critical Fourth Amendment protections by essentially eviscerating any constitutional distinction between a law enforcement officer entering a residence to conduct an investigation and a law enforcement officer stopping a suspect on the street for questioning.

IV

Plaintiff alleges that defendants violated the Fourth Amendment when they entered her home without a warrant. Although exigency based on bomb threats is alleged by defendants as the basis for their warrantless entry into plaintiff's home, the direction twice given by Hook to Principal Aranda to keep the students in their school building places the factual basis for defendants' alleged exigency into dispute. This factual dispute should result in our dismissal of this appeal for lack of jurisdiction.